***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Taylor with modifications. *Page 2 
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction over the parties and over the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The employer, Steve Jones Auto Group, is and was at all times relevant to the claims set forth herein, an employer, as that term is defined by the North Carolina Workers' Compensation Act, and subject to the provisions of the Act. Employer's claims are administered by Universal Underwriters Group.
4. Plaintiff's average weekly wage is $2,307.69, which yields a compensation rate of $674.00 per week, the maximum compensation rate at the time of plaintiff's injury, September 2, 2003.
5. Plaintiff's date of injury is September 2, 2003, the approximate date plaintiff was informed by competent medical authority of the nature and work-related cause of the disease.
6. The medical records are identified and received as Stipulated Exhibit A and Stipulated Exhibit A-1 and are admissible without further foundation or proof.
7. Plaintiff's medical bills are identified and received as Stipulated Exhibit B and those bills are subject to a determination by the Industrial Commission whether medical treatment arose out of and was related to plaintiff's alleged workers' compensation claim, and whether the *Page 3 
treatment was reasonably necessary to effectuate a cure, give relief or lessen the period of disability.
8. Industrial Commission Forms, identified as Stipulated Exhibit C, and Plaintiff's Exhibits 1-54 have been admitted into evidence by the parties. Plaintiff also submitted a sealed copy of his civil settlement agreement as evidence in this matter.
9. Plaintiff's issues to be addressed by the Commission are:
 a. Did plaintiff develop an occupational disease as a result of his exposure to toxic mold occurring within the course and scope of his employment; and
 b. What benefits, if any, is plaintiff entitled to receive under the Workers' Compensation Act.
10. Defendants' issues to be addressed by the Commission are:
 a. Whether plaintiff's reaction to mold meets the statutory definition of a compensable occupational disease, which, under N.C. Gen. Stat. § 97-57(13), must be "due to causes and conditions which are characteristic of and peculiar to" the automobile dealership trade, occupation or employment;
 b. Whether plaintiff's condition is the result of a personal sensitivity to respirable mold;
 c. To what disability compensation, if any, is plaintiff entitled;
 d. To what medical compensation, if any, is plaintiff entitled;
 e. If plaintiff's claim is compensable, have third-party settlement proceeds been distributed, to whom were they distributed, and, pursuant to N.C. Gen. Stat. § 97-10.2(h), *Page 4 
may any resulting lien be enforced against persons receiving such funds; and
 f. If plaintiff's claim is compensable, what is the distribution of plaintiff's third-party settlement proceeds pursuant to N.C. Gen. Stat. § 97-0.2(f)(1).
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 50 years old and was a minority owner of Steve Jones Auto Group. In 1998, plaintiff was general manager and responsible for making all of the management decisions for two dealerships, and oversaw sales, finance, and insurance for the dealerships.
2. Between 1998 and mid-2000, plaintiff was very professional, sharp and good with both customers and finances. Plaintiff was called "Hewlett-Packard" because of his ability to calculate payments and numbers in his head. At no time prior to mid-2000 did plaintiff have any medical conditions that prevented him from performing all of his duties and responsibilities on a full-time basis. Plaintiff often worked 10-12 hour days. Fellow employees, including Gardner Barbour, Ben Himsel, Neal Childress and David Voss, who observed plaintiff on a regular basis between 1998 and mid-2000, testified that they did not observe any type of medical condition or ailment that either prevented or impaired plaintiff from performing his duties and responsibilities, or impaired him in any way with respect to his duties and responsibilities. Plaintiff did not wheeze or cough. *Page 5 
3. At the end of 2000, Myrick Construction completed an addition to the office space in one of plaintiff's dealerships. During construction, plaintiff reported to Myrick Construction that he observed water intrusion issues, and on each occasion, Myrick reported to plaintiff that the water issues had been resolved. In early to mid-2000, the remodeling was complete, and plaintiff moved to his office in the building. The office had a desk and chair. The chair was located approximately two feet from the back wall and window. Plaintiff spent significant time in his office performing his duties and responsibilities.
4. Following the completion of the remodeling and the re-occupancy of the building, plaintiff and defendant, Steve Jones Auto Group, Inc., reported to Myrick issues regarding water intrusion in plaintiff's office. Evidence of water intrusion was visible after heavy rains and was usually evidenced by dampness or wetness in the carpet in plaintiff's office.
5. Myrick Construction's placement of a gutter and downspout outside plaintiff's office and its failure to properly caulk and seal along the base of the exterior wall of plaintiff's office caused water intrusion into the wallboard, wall cavity, sheetrock, flooring and carpeting of plaintiff's office. The back window to plaintiff's office was not properly waterproofed, which also resulted in water entering into the office area.
6. Plaintiff began to experience medical problems he had not experienced in the past. These problems included excessive and uncontrolled coughing, wheezing, burning sensation in his nose and mouth, headaches and dizziness and a lack of energy or malaise. In addition to these medical symptoms, plaintiff's work performance began to deteriorate. Specifically, plaintiff gradually lost his ability to calculate in his head, had severe memory problems which affected his work performance, problems reasoning and due to lack of energy, was unable to work full days. These medical and performance issues continued to progress and worsen from late 2000 until *Page 6 
September 2003. Although plaintiff continued to receive a wage of $10,000 per month, he was not performing his regular and customary duties as a general manager and indeed another manager was hired in April 2003.
7. Plaintiff continued to receive his $10,000 salary until December 28, 2005. As a result of plaintiff's disability, he has not been paid any wage compensation since December 28, 2005.
8. Plaintiff noticed wetness and a musty odor, but continued to work in the dealership until 2003. It was later determined that the construction was faulty and that water seeped into the interior space of the dealership near plaintiff's office. On August 27, 2003, the walls in plaintiff's office were removed, revealing an extensive growth of organic materials.
9. Neal Childress described the wall cavity of Mr. Jones' office as "heavily laden" with mold. Photographs offered by plaintiff show mold in the wall cavity. After the sheetrock was cut open and the mold exposed, plaintiff contacted Mike Shrimanker of EEC, Inc. Mr. Shrimanker is a certified industrial hygienist, a registered professional engineer, a certified safety professional, a certified audio-metric technician and a certified AHERA inspector. He has a B.S. in Engineering and Chemistry and Physics in Engineering as well as a M.S. in Chemical Engineering. On August 27, 2003, Mr. Shrimanker took air and tape samples in plaintiff's office. The tape test revealed many stachybotrys species as well as elevated levels of aspergillus and penicillium species. The air samples also revealed elevated levels of penicillium, stachybotrys and aspergillus.
10. Mr. Shrimanker observed black mold in plaintiff's office prior to the tests. This mold was located on the inside of the sheetrock, insulation, and electrical receptacles as well as in the carpet in plaintiff's office. According to Shrimanker, the sheetrock behind the wall had also *Page 7 
been "covered with mold" due to defects in construction, and the saturation had been going on for a "long time."
11. Mr. Shrimanker was of the opinion that under normal conditions to which the general public is exposed, stachybotrys should not be present at any level. Although penicillium and aspergillus are commonly found in the outside air, the levels of aspergillus and penicillium should be greater outdoors than indoors. The mold testing performed on August 27, 2003 found no stachybotrys in the outdoor sample and high levels of stachybotrys in the tape and air samples in plaintiff's office. According to Mr. Shrimanker, both the air and bulk samples "indicated that stachybotrys spores were present in high concentrations." The testing found no aspergillus in the outdoor sample, taken just outside Mr. Jones' office, and no elevated levels of aspergillus on the tape and air samples in Mr. Jones office. There were small levels of penicillium in the outdoor sample, but the levels of penicillium in the air and tape samples in Mr. Jones' office were significantly greater than the outdoor sample.
12. Exposure to stachybotrys, which contains mycotoxins, can cause different symptoms in different individuals. Common symptoms include coughing, headache, dizziness, malaise, burning in the nose and mouth, and cold and flu-like symptoms. Plaintiff was experiencing most, if not all, of these symptoms between late 2000 and August 27, 2003 when the samples were originally tested.
13. Stachybotrys is known as "black mold," and, according to Mr. Shrimanker, is the most dangerous of the molds because of its ability to produce mycotoxins. Stachybotrys may produce a trichothecene mycotoxin-sutratoxin H — "which is poisonous by inhalation." Penicillium can cause extrinsic asthma and some species can also produce mycotoxins. Aspergillius can also produce mycotoxins. *Page 8 
14. As the mold dries out, it can be released by pressure, or walking on the carpet and by air movement through the use of air conditioning or heating unit. Defendants' expert, Dr. Dalton, agreed with this assessment. According to Mr. Shrimanker, mold can also travel from wall cavities into air through openings in the wall, including electrical receptacles.
15. The stachybotrys, penicillium, and aspergillus species found in plaintiff's office in late 2000 through August 27, 2003 were released into the air in the office.
16. Between late 2000 and August 2003, as a result of plaintiff's presence in his office, he was exposed to and inhaled mold spores, including stachybotrys, penicillium and aspergillus.
17. Plaintiff's home was tested for mold and no unusual or elevated levels of mold were found.
18. Prior to plaintiff's mold exposure, he had been diagnosed with childhood asthma and reflux disease. Plaintiff also had previously undergone surgery for a hernia. Plaintiff had not suffered from any asthmatic attacks in at least the three to four years prior to his mold exposure, and was not required to use a nebulizer or inhaler for his asthma. Plaintiff would periodically use an inhaler when he had bouts of bronchitis or pneumonia. Prior to plaintiff's mold exposure at his work place, he was capable of performing all of his duties and responsibilities as general manager of the two dealerships.
19. Plaintiff has not been capable of performing his regular and customary job duties since at least April 2003. Plaintiff exercises poor business judgment and experiences lack of recall and memory, a lack of energy, excessive coughing, and wheezing. In addition, plaintiff suffers from cataracts, osteoporosis, and avascular necrosis, all the result of the steroid medications plaintiff was required to take as a result of his mold exposure. *Page 9 
20. Dr. David C. Thornton is plaintiff's treating physician and is board certified in pulmonary medicine, internal medicine, critical care medicine and sleep medicine. Plaintiff was referred to Dr. Thornton by Dr. Harvey Wolf, plaintiff's primary care provider in October 2003.
21. Dr. Thornton indicated stachybotrys is considered at the very top of the list of dangerous molds and is the most noxious and most likely to affect human health in an adverse way.
22. Dr. Thornton found plaintiff's asthma had been "very well under control and not much of a bother to him." When plaintiff presented to Dr. Thornton, his lungs were hyperinflated "demonstrating a propensity to trap air, suggesting that the small airways were inflamed and blocking off the lung."
23. During plaintiff's initial visit to Dr. Thornton, plaintiff also reported issues regarding cognitive deficits including problems with memory, dizziness, and an inability to focus.
24. Dr. Thornton started plaintiff on corticosteroid therapy which helps suppress the immune system thereby decreasing the inflammation of the airways and gave plaintiff inhaled steroids.
25. Dr. Thornton was of the opinion that plaintiff's exposure to mold in the work place was the cause of the inflammation in his lungs.
26. Dr. Thornton was of the opinion plaintiff's exposure to stachybotrys, aspergillus, and other molds present in his office, placed him at an increased risk, greater than that of members of the general public, of developing the inflammation in his lungs.
27. Prednisone has many side effects including intravascular necrosis of the hip joints and cataract formation as well as anxiety and mood changes and depression and Cushings Syndrome, which is a form of weight gain and water retention, all of which plaintiff has acquired. *Page 10 
28. Dr. Thornton was of the opinion that plaintiff has been quite depressed and has had mood alterations, including significant anxiety due to the steroids.
29. In Dr. Thornton's opinion, the debilitating symptoms that plaintiff exhibits, including problems with breathing, coughing, inflamed airways, and the acceleration or exacerbation of those symptoms, as well as his cognitive defects are all caused by long term exposure to stachybotrys and other molds and their toxins.
30. Dr. Thornton was of the opinion that plaintiff's exposure to mold was occupational in nature and not a personal sensitivity that produces "a noxious reaction." According to Dr. Thornton, in situations of occupational asthma mediated by a toxin, "we often see a worsening of asthma due to the inflammatory response from an intense exposure." Dr. Thornton was not aware of any medical records or reports by any physicians that plaintiff had this type of inflammation in his airways prior to his exposure to high levels of stachybotrys and other molds while at work, and he was not aware of any other substance that plaintiff was exposed to, other than the elevated levels of mold for a two to three year period, that would have caused the increase in his cough and airway inflammation.
31. Dr. Thornton described the stachybotrys mold as a "particularly nasty mold because it's capable, like all molds, of provoking an immune response." ". . . it also produces toxins that we know can affect the human body and human function."
 "Some of these toxins will be lethal, actually, if they are taken in larger doses, and some of these molds produce toxins that we call aflatoxins, and aflatoxins have been used in biochemical warfare by certain nations. So when we say these are lethal or harmful to humans, they are indeed."
32. Dr. Thornton described exposure to stachybotrys as well as actinomyces like aspergillus as a "rough combination" and that "three molds over a prolonged exposure" is what *Page 11 
"really perpetuated and established in him an immunologic state that perpetuated a very serious illness."
33. The basis for Dr. Thornton's causation opinions is not just the temporal relationship, which he described a "quite compelling," but the level of mold on the occupational health testing, the types of mold present, the intensity of the exposure, the duration of the exposure, and the fact that anti-bodies were identified in plaintiff's blood stream.
34. Dr. Thornton was of the opinion that plaintiff's illness is not reversible and that his symptoms are permanent in nature.
35. On October 23, 2003, plaintiff saw Dr. Peter Kussin, a board-certified physician in both internal medicine and pulmonary medicine and an Associate Clinical Professor of Medicine at Duke University, on referral by Dr. Donald Schmechel, a physician at the Memory Disorder Clinic at Duke. Dr. Kussin performed pulmonary function tests, which were abnormal and showed a degree of hyperinflation in the lungs as well as abnormalities and diagnosed plaintiff with asthma and vocal cord dysfunction.
36. According to Dr. Kussin, plaintiff is going to have symptoms related to cough, wheezing, and inflammation of the lungs for the rest of his life.
37. Dr. Kussin was of the opinion that plaintiff's persistent asthma was causally related to his exposure to mold at the work place. Plaintiff's airways were "subjected to an inflammatory stimulant, the mold spores, which caused progressive problems with inflammation and narrowing of his airways"; the long term level of exposure to mold caused inflammation in plaintiff's airway passages; and the inflammation causes plaintiff new problems such as not being able to be around perfumes, car exhaust, and strange smells. *Page 12 
38. Plaintiff returned to Dr. Kussin in January 2005. Lung function test results revealed plaintiff's lungs were worse even though plaintiff had been removed from the occupational stimulant. Dr. Kussin recommended that plaintiff never return to the dealership again.
39. Dr. Kussin was of the opinion, that plaintiff's persistent asthma and other conditions are permanent in nature.
40. In Dr. Kussin's opinion, plaintiff's childhood asthma was resolved or in remission, not symptomatic, but the mold exposure, acting as a triggering mechanism, now caused sensitivities to exhaust, perfume, strange smells and odors that were not a problem prior to his exposure and that is a new condition.
41. Dr. Kussin was further of the opinion that avascular necrosis is a side effect of the use of Prednisone. Plaintiff is taking Prednisone because of the persistent asthma triggered by plaintiff's mold exposure.
42. On October 13, 2003, plaintiff presented to Dr. Donald Schmechel who has an undergraduate degree in chemistry from Yale University and went to medical school at Harvard Medical School. Dr. Schmechel performed his medical internship at Duke University and participated in four years of clinical neurobiology research as a Public Health Officer for the National Institute of Mental Health. Dr. Schmechel is currently a full professor at Duke University and is board-certified in neurology and psychology. Dr. Schmechel's emphasis and practice is in cognitive disorders, including the disturbance of memory and problems of performance, behavior and attention. Plaintiff related significant physical problems as a result of exposure to black mold, including significant pulmonary problems with coughing and asthma as well as cognitive problems related to memory loss and cognitive functioning. Plaintiff also *Page 13 
described significant headaches, starburst events, visual disturbances, tingling and left hand numbness.
43. Upon examination Dr. Schmechel found plaintiff to be "medically ill" with vascular changes in his eye grounds, fullness in the tissues in the back of his throat consistent with inflammation allergies, wheezing and coughing, clearly having asthmatic reactive airway disease.
44. Dr. Schmechel also performed a full neurological exam that included a cognitive screening, including a mini mental status exam as well as complex sequential activities. Plaintiff had an abnormal result. Plaintiff demonstrated an inability to follow a line of questioning or reasoning very easily and is easily distractible. Dr. Schmechel diagnosed plaintiff with mild cognitive impairment and neural dementia.
45. Dr. Schmechel testified that inflammation of the lung can cause the brain damage, including the cognitive impairment experienced by plaintiff.
47. Dr. Schmechel referred plaintiff to Deborah Attix, Ph.D. a neuropsychologist at Duke, for neuropsychological testing. The neurological testing, performed on March 18, 2004, revealed a mild degree of depressive symptomatology with isolated, but clinically significant, executive problem solving and concept formation deficits and other possible mild inefficiencies. Dr. Attix's conclusion that Mr. Jones had clinically significant executive problem solving and concept function deficits was consistent with Dr. Schmechel's exam and treatment.
48. It is Dr. Schmechel's opinion that Mr. Jones' pulmonary disease is the most likely cause of his executive dysfunction and/or cognitive dysfunction, that plaintiff is going to remain at the current level of cognitive function/deficit, that plaintiff's condition is permanent and that as a result of plaintiff's deficits in executive problem solving, he has an essentially disabling condition. *Page 14 
49. On August 16, 2005, plaintiff presented to Dr. Jason Guevara, a board-certified orthopedist who specializes in knee and hip treatment, on referral from his internist. Plaintiff complained of occasional sciatica and right lateral hip pain. Plaintiff was diagnosed with avascular necrosis in both hips, a condition where there is no blood to the bones in the hip, resulting in death of the bone.
50. Dr. Guevara is of the opinion that plaintiff's steroid use caused the avascular necrosis.
51. Dr. Guevara next saw plaintiff on February 16, 2006 and found "definite progression" in plaintiff's avascular necrosis. Dr. Guevara was of the opinion that plaintiff needed a double hip replacement on February 16, 2006 and on April 25, 2007.
52. Once avascular necrosis has progressed as far as it has with plaintiff, it is not reversible and the only treatment is complete hip replacement.
53. Plaintiff presented to Dr. John Miller, an optometrist, practicing with Carolina Eye Associates in Pinehurst, in August 2004. Plaintiff saw Dr. Miller for blurred vision following eleven months of steroid use.
54. In the opinion of Dr. Miller, plaintiff has developed a cataract in both his left and right eye as a result of his steroid use. Dr. Miller is treating Mr. Jones for his cataracts, which have not progressed to the point of surgery. According to Dr. Miller, not withstanding a decrease or elimination in Mr. Jones' steroid use, he will continue to suffer from cataracts.
55. The defendants retained Dr. Allen Hayes and Dr. Bruce Dalton, as experts. The Full Commission has reviewed the testimony and opinions of Drs. Hayes and Dalton and does not find them persuasive. The Full Commission gives greater weight to the testimony and opinions of plaintiff's treating physicians. *Page 15 
56. Plaintiff's work place exposure to mold caused plaintiff's pulmonary condition and was a substantial contributing factor in the development of plaintiff's pulmonary airway disease and resulting conditions.
57. Plaintiff's employment, and specifically, his exposure to mold for approximately three years, exposed plaintiff to a greater risk of developing his pulmonary airway disease than members of the general public not so employed.
58. Plaintiff has developed an occupational disease as defined by N.C. Gen. Stat. § 97-53(13) and the applicable case law.
59. As a result of the development of plaintiff's occupational disease, plaintiff is currently totally disabled from employment and has been unable to engage in the same or any other employment from December 28, 2005 and continuing.
60. Plaintiff is entitled to temporary total disability compensation at the rate of $674.00 per week from December 28, 2005 and continuing.
61. There is a substantial likelihood, indeed a certainty, that plaintiff will require future medical treatment as a result of his compensable occupational disease and related conditions.
62. Plaintiff is entitled to have defendants provide all past and future medical treatment necessitated by his compensable occupational disease and its related conditions as long as the same is reasonably necessary to provide relief, effect a cure or lessen plaintiff's disability.
63. Plaintiff's disability was not caused by a "personal sensitivity" to mold.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW *Page 16 
1. Plaintiff's work place exposure to mold caused plaintiff's pulmonary condition and was a substantial contributing factor in the development of plaintiff's pulmonary airway disease and resulting conditions. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's employment, and specifically, his exposure to mold for approximately three years, exposed plaintiff to a greater risk of developing his pulmonary airway disease than members of the general public not so employed. See Id.
3. Plaintiff has developed an occupational disease as defined by N.C. Gen. Stat. § 97-53(13) and the applicable case law. SeeId.
4. As a result of the development of plaintiff's occupational disease, plaintiff is currently totally disabled from employment and has been unable to engage in the same or any other employment from December 28, 2005 and continuing. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to temporary total disability compensation at the rate of $674.00 per week from December 28, 2005 and continuing. See Id.
6. There is a substantial likelihood, indeed a certainty, that plaintiff will require future medical treatment as a result of his compensable occupational disease. N.C. Gen. Stat. §§ 97-2(19); and 97-25.
7. Plaintiff is entitled to have defendants provide all past and future medical treatment necessitated by his compensable occupational disease and its related conditions as long as the same is reasonably necessary to provide relief effect a cure or lessen plaintiff's disability. See Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD *Page 17 
1. For his total disability, defendants shall pay to plaintiff compensation at the rate of $674.00 per week beginning December 28, 2005 and continuing. Portions of this amount have accrued and shall be payable in a lump sum. These amounts are subject to an attorney's fee approved herein.
2. Defendants shall pay directly to plaintiff's counsel 25% of the past due compensation specified in Paragraph 1 above and such amount shall be paid in a lump sum. Thereafter, defendants shall deduct from plaintiff's compensation and paid directly to plaintiff's counsel every fourth check.
3. Defendants shall pay all past and future medical expenses incurred by plaintiff as a result of his compensable occupational injury and related conditions.
4. Defendants shall pay the costs, including an expert witness fee of $230.00 to Dr. John Miller, $335.00 to Dr. Bruce Dalton and $650.00 to Dr. Allen Hayes.
This ___ day of September 2008.
S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 18 
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1